UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRACY AUGUST, #714643,

                       Plaintiff,            Civil Action No. 12-13775
                                             Honorable Laurie J. Michelson
v.                                         Magistrate Judge David R. Grand

PATRICIA CARUSO, *et al.*,

                       Defendants.
_____/

## REPORT AND RECOMMENDATION TO GRANT
## THE MEDICAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [65]

       Before the Court is the Motion for Summary Judgment filed on May 7, 2014, by the four remaining defendants in this case, Dr. Robert Lacy, Dr. Pu Qin, Dr. Michael Szymanski, and Dr. Maureen Onuigbo (collectively the "Medical Defendants"). (Doc. #65). After the Court granted her numerous extensions, *pro se* plaintiff Tracy August ("August"), an incarcerated person, submitted a response to this motion on November 6, 2014 (Doc. #78), and the Medical Defendants filed a reply on December 8, 2014 (Doc. #82). An Order of Reference was entered on April 1, 2013, referring all pretrial matters to the undersigned pursuant to 28 U.S.C. §636(b). (Doc. #25).

       Generally, the Court will not hold a hearing on a motion in a civil case in which a party is in custody. *See* L.R. 7.1(f). Here, the Court finds that the facts and legal issues are adequately presented in the briefs and on the record, and it declines to order a hearing at this time.

## I.    RECOMMENDATION

       For the reasons set forth below, **IT IS RECOMMENDED** that the Medical Defendants' Motion for Summary Judgment [65] be **GRANTED**.

II.     **REPORT**

    A.     **Background**

August is a State of Michigan prisoner who is confined at the Women's Huron Valley Complex in Ypsilanti, Michigan. (Doc. #1 at ¶4). She brought this civil rights action pursuant to 42 U.S.C. §1983 against various medical providers employed (or formerly employed) by the Michigan Department of Corrections ("MDOC") and Prison Health Services, Inc. ("PHS"). On January 8, 2013, the District Court entered an Opinion and Order of Partial Summary Dismissal, dismissing August's claims against several of the named defendants. (Doc. #6). And, on December 24, 2013, the District Court adopted this Court's Report and Recommendation granting the MDOC defendants' motion for summary judgment. (Doc. #53). Thus, the only claim that remains is August's Eighth Amendment claim against the Medical Defendants.

    B.     **The Relevant Allegations in August's Complaint and Amended Complaint**

Generally speaking, August asserts in her complaint that she injured her left shoulder on August 25, 2009, when she was ordered to restrain another prisoner, who was having a seizure. (Doc. #1 at ¶¶28-34). August alleges that she was pinned against a railing when, as she was attempting to help, the other inmate threw her body backward. (*Id.* at ¶33).

August further alleges that three days after the incident, she was seen by a nurse, who informed her that she "appeared to have a Torn Rotator Cuff" and referred her to a medical services provider ("MSP"). (*Id.* at ¶54). The nurse put August's arm in a sling, gave her medication for pain, told her to use an ice pack, and advised her to restrict her activities and work. (*Id.*). August further alleges that, on September 5, 2009, she was seen by a physician's assistant, who told her to continue taking the pain medication. (*Id.* at ¶58). August requested an x-ray and MRI, but neither was ordered. (*Id.*). She alleges that, over the course of the next three

years, she continued to have pain, and the Medical Defendants continued to prescribe medication but refused to send her to be seen by a specialist.  (*Id.* at ¶¶21-24).  Additionally, she alleges that, on one occasion, on August 11, 2010, Dr. Lacy examined her in an unreasonably "rough" manner, causing her "tremendous pain."  (*Id.* at ¶105).

On September 13, 2012, August filed an amended complaint, in which she alleges that on August 15, 2012, she saw Dr. Lacy, and he stated he would be ordering "Cortizone [sic]" steroid injections and a bottom bunk detail.  (Doc. #5 at ¶9).  August further alleges that she subsequently sent several healthcare request forms ("kites") when she did not receive these injections or bottom bunk detail.  (*Id.* at ¶10).  According to August, on August 28, 2012, she received a kite response stating that Dr. Lacy had not ordered any new medication on August 15, 2012, and that she did not meet the criteria for a bottom bunk.  (*Id.* at ¶11).  August asserts that the nurse who issued this kite response was overriding Dr. Lacy's order, which is outside the scope of her authority.  (*Id.*).  August further alleges that, on August 29, 2012, she sent a kite directly to Dr. Lacy regarding the fact that she had not received the cortisone injections or bottom bunk detail, but she never received a response.  (*Id.* at ¶12).

C.     **The Relevant Medical Evidence**

Because August is alleging that the Medical Defendants provided constitutionally inadequate medical care, a thorough review and discussion of her medical records is necessary.[1] Below is a chronological summary of the care and treatment that August received for her shoulder injury, taken primarily from her own medical records, as well as relevant affidavits.

On August 28, 2009, August was seen by a nurse for an injury to her left shoulder that

---

[1] August "disputes the accuracy of the medical records," but she fails to identify any specific record that she believes is missing or altered, and fails to provide any evidence which would establish any particular record's inaccuracy.  (Doc. # 78 at 11).

she reported to have sustained when she was pressed between an inmate and a railing. (Doc. #65-3 at ¶3). The nurse noted that August's left shoulder appeared to be normal, but that movement in that shoulder was limited and August would be referred to an MSP.[2] (Doc. #67-3 at 37). As a result, August was seen later that same day (August 28, 2009) by Nurse Practitioner Deborah Lange. (Doc. #65-3 at ¶4). August reported experiencing throbbing pain, which she rated a 7/10 on the pain scale. (Doc. #67-3 at 28). NP Lange noted that August exhibited tenderness in the posterior area of the left shoulder and decreased range of motion on abduction. (*Id.* at 29). She noted none of the following to be present: bony deformity, erythema, edema, ecchymosis, abrasions, or breaks in skin integrity. (*Id.*). Her assessment was that August had a left shoulder strain. (*Id.*). She prescribed Motrin, placed August's arm in a sling, and provided ice packs. (*Id.*). She also gave August a detail for light duty and noted that she should not lift, push, pull, or use her left arm. (*Id.* at 31).

On September 2, 2009, August submitted a kite stating that her left shoulder pain was not responding to treatment. (Doc. #65-3 at ¶5). She was seen on September 5, 2009, by Physician's Assistant Savithri Kakani. (*Id.* at ¶6). August complained of shoulder pain and reported taking aspirin for that pain. (Doc. #67-3 at 22). PA Kakani noted that August was wearing a sling and complained of pain when her arm was pushed in an upward motion. (*Id.*). PA Kakani instructed August on pendulum exercises and advised her to use over-the-counter pain medications. (*Id.* at 23). Pendulum exercises are used to get movement in a patient's shoulder joint. (Doc. #65-3 at ¶6). They are used to avoid adhesive capsulitis – also known as "frozen shoulder" – which can result from extended underuse or nonuse. (*Id.*). PA Kakani

---

[2] The term "MSP" or "medical services provider" refers to nurse practitioners, physicians, medical doctors, and osteopaths. (Doc. #65-3 at ¶3). An inmate referred to see an MSP may see a doctor or a mid-level provider (NP or PA). (*Id.*).

4

advised August to discontinue wearing the sling and follow up in six weeks.  (Doc. #67-3 at 23).

The medical records show that August was next seen for her shoulder by a nurse on March 17, 2010, after she submitted a healthcare kite on March 9, 2010.  (Doc. #65-3 at ¶7; Doc. #67-3 at 17).  August reported that the pain in her left shoulder had not improved since the injury.  (Doc. #67-3 at 15).  The nurse noted that August reported pain in the left shoulder with movement, weakness, numbness, and limitation of range of motion.  (*Id.*).  The nurse's assessment was strain/sprain of the shoulder.  (*Id.*).

On March 31, 2010, August was seen by Dr. Onuigbo.  (Doc. #65-3 at ¶8; Doc. #65-5 at ¶3).  This was Dr. Onuigbo's only encounter with August concerning her shoulder.  (Doc. #65-5 at ¶2).  August was seen on this date for a complaint of pain in her feet.  (*Id.* at ¶3; Doc. #67-3 at 9).  During this visit, however, the issue of August's shoulder came up.  August reported moderate pain and limitation in the range of motion in her left shoulder.  (Doc. #67-3 at 9).  She indicated that the condition was not getting worse, but had not improved over time.  (*Id.*).  Dr. Onuigbo noted that August had moderately reduced range of motion.  (*Id.*).  August expressed tenderness, especially in the posterior area of the left shoulder around the acromioclavicular (AC) joint.  (*Id.*).  August was unable to raise her left arm above the shoulder level, and Dr. Onuigbo noted slight weakness in her left arm (4 out of 5).  (*Id.*).  Neurological testing was normal.  (*Id.*).  Dr. Onuigbo's assessment was chronic shoulder pain. (*Id.*).   Given the focal location of the pain, Dr. Onuigbo suspected that arthritis was the cause of this pain.  (Doc. #65-5 at ¶3).  This is because the AC joint is a very common area for arthritis to develop.  (*Id.*).  She ordered Motrin and x-rays and instructed August to return if the condition did not improve within thirty days.  (Doc. #67-3 at 10).

In her affidavit, Dr. Onuigbo stated that her assessment of chronic shoulder pain was not

a diagnosis; rather, it was merely a description of August's clinical presentation. (*Id.* at ¶4). Dr. Onuigbo further indicated that while she suspected arthritis to be the cause of this pain, she did not reach a final medical opinion on this issue. (*Id.*). That would have required her to review the x-ray results and to further examine August. (*Id.*). However, Dr. Onuigbo had no further involvement in August's care after March 31, 2010, and she took at new job in May 2010. (*Id.*).

On April 16, 2010, x-rays were performed of August's left shoulder. (Doc. #65-3 at ¶9). The radiologist noted that there were signs of early arthritic changes in the AC joint, but no evidence of an acute displaced fracture or acute osseous abnormalities. (Doc. #67-3 at 5).

After submitting another healthcare kite on June 6, 2010, August was seen by a nurse on June 16, 2010. (Doc. #65-3 at ¶10; Doc. #67-3 at 4). She reported intermittent shoulder pain, which was worse with movement. (Doc. #67-2 at 98). The nurse's examination of August's shoulder revealed no abnormalities, except for weakness and limitation of movement. (*Id.*).

On June 23, 2010, August was seen by Dr. Lester de Guzman for complaints of consistent pain radiating up her upper back, which was made worse by reaching. (Doc. #65-3 at ¶11). Dr. de Guzman noted that x-rays were negative for bony abnormalities. (Doc. #67-2 at 97). August reported that aspirin and Motrin were not helping her pain. (*Id.*). Dr. de Guzman performed a drop arm test to evaluate for a supraspinus (rotator cuff) muscle tear, and the test showed no abnormality. (*Id.*). He also noted that there were no signs of impingement. (*Id.*). Abduction and internal rotation were noted to be mildly to moderately limited. (*Id.*). Strength of the rotator cuff muscles was noted to be decreased due to the complaint of shoulder pain. (*Id.*). Dr. de Guzman's assessment was rotator cuff syndrome, which, in this case, described a strain/sprain in the area of the rotator cuff. (*Id.*; Doc. #65-3 at ¶11). The negative drop arm test diagnostically excluded a full thickness rotator cuff tear. (Doc. #65-3 at ¶11). Dr. de Guzman's

6

progress note indicates that he planned to prescribe non-steroidal anti-inflammatory medication (NSAIDS).[3]  (Doc. #67-2 at 97).

Dr. Lacy saw August on August 11, 2010, for her complaint of moderate shoulder pain in the area of the scapular.  (Doc. #65-3 at ¶13).  Dr. Lacy noted that a recent x-ray showed AC joint arthritis but was otherwise normal.  (Doc. #67-2 at 94).  He performed stability and laxity testing on the left shoulder, which were normal and indicated no tendon injuries.  (*Id.* at 95).  Dr. Lacy also attempted to perform testing for a torn rotator cuff, including the drop arm test, the lift off test, and the cross over test.  (*Id.*).  Dr. Lacy believed, however, that August was not giving a sincere effort, which prevented him from obtaining important diagnostic information.  (Doc. #65-3 at ¶13).  He repeated these tests several times and got different results each time.  (*Id.*).  In Dr. Lacy's words, "Nothing about the examination made sense from a medical standpoint." (*Id.*).  August's range of motion changed considerably throughout the exam; the location of her pain did not correlate with her reported deficits; and her deficits did not match her report of her injury.  (Doc. #67-2 at 95).  In his affidavit, Dr. Lacy indicated his strong belief that August "was trying to manipulate the findings.  When she was asked to provide resistance for strength testing of the rotator cuff, she would go limp.  When she was asked to go limp for passive range of motion testing, she flexed her muscles in resistance."  (Doc. #65-3 at ¶13).  Her exertion of resistance to prevent Dr. Lacy from passively testing her range of motion showed the absence of a rotator cuff tendon rupture or full thickness rotator cuff tear, however.  (*Id.*).  Dr. Lacy indicated in his progress note that he gave up trying to test August's shoulder because she would

---

[3] Although not noted on the progress note, Dr. de Guzman prescribed Ultram, a pain medication that contains a synthetic narcotic, for thirty days.  On July 2, 2010, August submitted a kite inquiring about receiving this prescription.  (Doc. #67-2 at 96).  According to Dr. Lacy, as he would have expected, the Regional Medical Officer apparently disapproved Dr. de Guzman's prescription for Ultram, as narcotics and synthetic narcotics are not indicated for a sprain/strain type of injury.  (Doc. #65-3 at ¶12).

not stop trying to "cheat" on the test.[4]  (Doc. #67-2 at 95).  Ultimately, while Dr. Lacy could rule

out a serious condition, August's conduct confounded his effort to provide a discrete assessment.

(Doc. #65-3 at ¶13).  Dr. Lacy further affirmed that, giving August the benefit of the doubt, he

would have assessed her with a strain/sprain, at most, and prescribed NSAIDS.  (*Id.*).  August

was already receiving this medication, however.[5]  (*Id.*).

   After seeing a nurse on November 1, 2010, August was again referred to an MSP for her

shoulder pain.  (Doc. #67-2 at 85-86).  August was seen by Dr. Michael Szymanski on

November 16, 2010, at which time she relayed the history of her injury.  (*Id.* at ¶16; Doc. #65-6

at ¶3).  This was Dr. Szymanski's only encounter with August concerning her shoulder.  (Doc.

#65-6 at ¶2).  Dr. Szymanski noted that the results of the April 2010 x-ray showed only mild AC

joint arthritis.  (*Id.* at ¶3).  August reported that aspirin and NSAIDS had not been helpful.  (Doc.

#67-2 at 81).  She also indicated, however, that she had recently started some exercises that were

shown to her by a nurse, and these were making her feel a little better.  (*Id.*).  Dr. Szymanski

noted that his examination of August's left shoulder revealed no redness or swelling, but she

exhibited mild pain with motion and had some tightness in the left parascapular and upper

trapezius muscles.  (*Id.* at 82).  He noted that the left AC joint was not tender and that abduction

improved when the shoulder was first internally rotated.  (*Id.*).  He advised August on the use of

---

[4] In his affidavit, Dr. Lacy indicated that it is very unusual for him to put something like this in a progress note.  (Doc. #65-3 at ¶13).  He would only make such an entry "if a patient was blatantly trying to thwart or manipulate the findings of an examination.  This was one of those very rare occasions."  (*Id.*).

[5] With respect to August's allegation that Dr. Lacy examined her in an inappropriate manner on this date, Dr. Lacy denies that he placed one hand on the front of her shoulder and then dug his fingers into her back shoulder blade, as August alleges.  (Doc. #1 at ¶105; Doc. #65-3 at ¶14). He indicated that this description does not fit any test he tried to perform on August.  (Doc. #65-3 at ¶14).  He further stated that he did not perform any test on August in a manner different from the technique he always employs, nor did he attempt to cause her unnecessary pain or discomfort.  (*Id.*).  His progress notes do not reflect that August expressed any significant pain during the examination, which is something he would have noted.  (*Id.*).

range of motion exercises, gentle massage, and gentle neck stretching.  (*Id.*).  He further advised her to continue taking aspirin, as long as it did not upset her stomach, and to wait until she regained full range of motion before trying exercises with weights.  (*Id.*).  Dr. Szymanski did not include an assessment in his progress note because he could not make an assessment based on this one examination.  (Doc. #65-6 at ¶4).  In his affidavit, Dr. Szymanski states that he was considering the possibility that August might have impingement syndrome, a condition in which inflammation and/or alteration of the internal structures of the shoulder restricts or prevents the shoulder joint from moving in one or more of its normal directions.  (*Id.*).  He further indicated that impingement syndrome is not related to a torn rotator cuff (of which he found no evidence).  (*Id.*).  The treatment for impingement syndrome is to take anti-inflammatory medication and to perform exercises to increase the range of motion of the joint, which is what Dr. Szymanski prescribed.  (*Id.*).

August was seen by a member of the nursing staff on January 3, 2011, at which time she reported pain with exercise that was "up the wall."  (Doc. #65-3 at ¶17).  The nurse instructed August to take NSAIDS and apply warm compresses, and she noted that she would have an MSP review August's medical records.  (Doc. #67-2 at 72).  An MSP reviewed August's records on January 17, 2011, and apparently found no additional treatment necessary.  (*Id.* at 73).

The medical records show that August was next seen on September 22, 2011, by a member of the nursing staff.  (Doc. #65-3 at ¶18).  The nurse noted that a drop arm test was negative and there was no sign of impingement.  (Doc. #67-2 at 51).  August could abduct against gravity without limitation, and strength of the rotator cuff muscles was equal bilaterally. (*Id.*).  August's internal rotation was mildly limited.  (*Id.*).  The nurse's assessment was musculoskeletal pain in the left shoulder.  (*Id.*).

9

The next day, September 23, 2011, August was seen by another member of the nursing staff for her complaints of shoulder pain.  (Doc. #65-3 at ¶19).  The nurse noted that August was crying, was unable to move her arm parallel to her shoulder, and could not flex her arm behind her back or stretch her arm to the front.  (Doc. #67-2 at 50).  The nurse ordered cold compresses for one week and a sling for one month, and noted that August would be seen by an MSP.  (*Id.*).

August was seen by Dr. Pu Qin on October 6, 2011.  (Doc. #65-3 at ¶20; Doc. #65-4 at ¶3).  This was Dr. Qin's only encounter with August concerning her shoulder.  (Doc. #65-4 at ¶2).  August reported left shoulder pain for two years, which she described as constant, with intermittent increases in severity.  (Doc. #67-2 at 54).  She said that movement increased her pain to 10/10 on the pain scale.  (*Id.*).  Dr. Qin's provisional assessment was that August had adhesive capsulitis (or frozen shoulder).  (*Id.* at 55).  He instructed her to do stretching exercises, including the climbing wall stretch, arm pit stretch, and towel stretch.  (*Id.*).  Dr. Qin prescribed gentle massage, warm compression, and Naproxen (which August indicated helped her pain a little bit).  (*Id.*).  He noted that she would be seen in three months but instructed August to return immediately if her symptoms worsened.  (*Id.*).  In his affidavit, Dr. Qin indicated that his assessment of adhesive capsulitis was not a definitive diagnosis; rather, it was a working diagnosis based on August's symptoms and his physical examination.  (Doc. #65-4 at ¶4).  Adhesive capsulitis can be caused by various factors, but regardless of the underlying cause, the treatment includes shoulder movement, pain control, symptom management (warm compression and gentle massage), steroid injection, and physical therapy.  (*Id.*).  The duration of frozen shoulder varies from patient to patient.  (*Id.*).

August was seen on May 8, 2012, by a nurse for a skin condition and shoulder pain.  (Doc. #65-3 at ¶21).  On examination, August had no weakness, discoloration, warmth to the

10

touch, numbness, or swelling, but she did complain of tenderness to palpation, spasms, and limitation of motion. (Doc. #67-2 at 26). August was also seen by a nurse on May 30, 2012, when she reported that her shoulder pain was 5/10 on the pain scale. (*Id.* at 31). Extra pillows were ordered, she was prescribed ice and cool compresses as needed, and she was instructed to submit a healthcare kite if her symptoms worsened. (*Id.*).

On June 19, 2012, August was again seen by a member of the nursing staff. (Doc. #65-3 at ¶23). After conducting an examination, the nurse commented that August presented with "pseudo" symptoms of a rotator cuff injury. (Doc. #67-2 at 21). August said her pain was only 3/10 following the current regimen, and she was purchasing pain medication from the prison store. (*Id.*). She was instructed to stretch as tolerated, use gentle massage, and apply warm compresses to her shoulder. (*Id.*). Two days later, on June 21, 2012, August was again seen by a nurse, where she complained of pain with movement and weakness. (Doc. #67-2 at 19). The nurse noted that she felt crepitus[6] in August's shoulder and instructed her to do her shoulder exercises and to return to the clinic as needed. (*Id.*; Doc. #65-3 at ¶24). August was also seen by a nurse on July 5, 2012, for a complaint of migraine headaches. (Doc. #67-2 at 15). August said she believed her shoulder pain and migraine headaches were related.[7] (*Id.*). However, she admitted to the nurse that she was not doing the exercises prescribed by the doctor; these were re-printed for her, and she was again advised to do them. (*Id.*).

August contends that Dr. Lacy saw her on August 15, 2012, and told her that he would issue a bottom bunk pass and provide a steroid injection to her shoulder. (Doc. #65-3 at ¶26).

---

[6] According to Dr. Lacy, crepitus is the feeling an examiner can detect when a joint is moved and it does not move in a completely smooth manner. (Doc. #65-3 at ¶24). It does not indicate any specific condition. (*Id.*). It may be associated with any joint abnormality or may be of no clinical significance. (*Id.*).

[7] In his affidavit, Dr. Lacy stated that a shoulder injury would not cause a patient with no previous documented history of migraines to develop such headaches. (Doc. #65-3 at ¶25).

Although there are no progress notes reflecting this visit, the record indicates that on September 10, 2012, Dr. Lacy issued a lower bunk pass and noted that a steroid injection was scheduled to be provided.  (*Id.*; Doc. #67-2 at 5-6).  Thus, it appears that Dr. Lacy had some type of encounter with August on August 15, 2012, and discussed with her these issues.[8]

August's lawsuit was filed on August 27, 2012, and Dr. Lacy saw her on two occasions after that date.  (*Id.* at ¶28).  Specifically, Dr. Lacy saw August on September 12, 2012, at which time he again attempted to thoroughly examine her, and his progress notes reflect the multiple tests he tried to perform.  (Doc. #67-1 at 98-99, 67-2 at 1).  However, as with his previous examination, Dr. Lacy strongly believed that August was not making a sincere effort.  (Doc. #65-3 at ¶28).  Therefore, Dr. Lacy was unable to obtain all the information he needed for a definitive diagnosis.  (*Id.*).  His provisional assessment was adhesive capsulitis of the shoulder, which was based on the length of time August had complained of shoulder pain and her limitation of movement.  (*Id.*; Doc. #67-1 at 99).  Dr. Lacy gave August a steroid injection in her shoulder, instructed her to increase fluid intake and follow the exercise program, and ordered that she be placed in a bottom bunk from September 10, 2012, to January 10, 2013.  (Doc. #67-2 at 1).

Dr. Lacy saw August again on January 30, 2013.  (Doc. #65-3 at ¶29).  He again attempted to provide a thorough examination, and August again did not cooperate with testing.  (*Id.*).  Dr. Lacy gave August another injection of cortisone and pain medication.  (*Id.*).  He instructed her to follow the exercise program and to take her medication as prescribed.  (*Id.* at

---

[8] It appears that this bottom bunk detail was not provided to August, in accordance with policy, until March 2013, despite the fact that she kited multiple times about this issue.  (Doc. #78 at 76-77, 82, 86-87, 90, 93-94).  Indeed, in an August 22, 2012, kite response, August was mistakenly informed that she did not "meet criteria for bottom bunk detail."  (Doc. #78-1 at 23).  Thus, it certainly appears that there was some kind of glitch in providing August this bottom bunk detail.  However, these events took place after the filing of August's complaint and amended complaint in this case and are not properly before the Court.

60).  He ordered Motrin and an x-ray of the shoulder.  (*Id.* at 59-60).  Dr. Lacy's provisional assessment was arthritis of the shoulder.  (*Id.* at 59).  On January 31, 2013, he ordered a bottom bunk pass for August until July 28, 2013.[9]  (*Id.* at 48).  Left shoulder x-rays were performed on February 7, 2013, and they showed only mild arthritic changes.  (*Id.* at 50).  No acute findings were identified.  (*Id.*).

### D.    Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga County Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011).  A fact is material if it might affect the outcome of the case under governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party.  *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts

---

[9] Again, August alleges that she did not receive a bottom bunk pass until March 17, 2013, and she claims that, in the interim, she fell out of a top bunk, reinjuring her shoulder, as well as her back, neck, and knees.  (Doc. #78-1 at 13).  In one sentence, at the tail end of her response to the Medical Defendants' motion for summary judgment, August asks that she be allowed to amend her complaint to include these injuries as part of her injuries.  (Doc. #78 at 22).  This request is addressed below.

13

showing a triable issue.'"  *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).   In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (internal quotations omitted).

### E.      Analysis

In their dispositive motion, the Medical Defendants argue that summary judgment is appropriate on August's Eighth Amendment claim because the evidence establishes that they were not deliberately indifferent to her serious medical needs.[10]  (Doc. #65).

August brings her claims under 42 U.S.C. §1983, which creates a cause of action against any person who, under color of state law, causes the deprivation of a right secured by the Constitution or the laws of the United States.  A Section 1983 claim must allege two elements: "1) the deprivation of a right secured by the Constitution or laws of the United States and 2) the deprivation was caused by a person acting under color of state law."   *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996).  August argues that the Medical Defendants' failures to provide timely and adequate medical care violated her right under the Eighth Amendment to be free from cruel and unusual punishment.   The Eighth Amendment's Cruel and Unusual Punishment Clause prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain" upon inmates.  *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987)

---

[10] The Medical Defendants also argue that August failed to exhaust her administrative remedies with respect to her claims against Drs. Qin and Szymanski, and with respect to some of her claims against Drs. Lacy and Onuigbo.  (Doc. #65 at 30-31).  Because the Court recommends granting summary judgment on the merits of August's Eighth Amendment claim against all of the remaining defendants, it need not address this exhaustion argument.

14

(internal citations omitted).  "'Deliberate indifference' by prison officials to an inmate's serious medical needs constitutes 'unnecessary and wanton infliction of pain' in violation of the Eighth Amendment's prohibition against cruel and unusual punishment." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 812 (6th Cir. 2005) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

The Sixth Circuit recently explained the standards that a plaintiff must satisfy to state a claim for deliberate indifference to her serious medical needs:

> A claim of deliberate indifference under the Eighth Amendment has both an objective and a subjective component.  The objective component requires the existence of a sufficiently serious medical need.  To satisfy the subjective component, the defendant must possess a "sufficiently culpable state of mind," rising above negligence or even gross negligence and being "tantamount to intent to punish."  Put another way, "[a] prison official acts with deliberate indifference if he knows of a substantial risk to an inmate's health, yet recklessly disregards the risk by failing to take reasonable measures to abate it."  Mere negligence will not suffice.  Consequently, allegations of medical malpractice or negligent diagnosis and treatment generally fail to state an Eighth Amendment claim of cruel and unusual punishment.

*Broyles v. Correctional Medical Servs., Inc.*, 478 F. App'x 971, 975 (6th Cir. 2012) (internal citations omitted).

Moreover, a plaintiff must demonstrate that a prison official knew of and disregarded an excessive risk to inmate health or safety by showing that (1) the official was aware of facts from which an inference could be drawn that a substantial risk of serious harm existed, and (2) the official actually drew the inference.  *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  As the Sixth Circuit has recognized, the requirement that the official subjectively perceived a risk of harm and then disregarded it is "meant to prevent the constitutionalization of medical malpractice claims; thus, a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001).  The *Comstock* court further explained:

15

> When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation.  On the other hand, a plaintiff need not show that the official acted 'for the very purpose of causing harm or with knowledge that harm will result.'  Instead, 'deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.'

*Id.* (internal citations omitted).

August's own statements, as well as the record evidence, demonstrate that, under these standards, the Medical Defendants were not deliberately indifferent to a serious medical need. By August's own admission, she has been seen by several nurses, nurse practitioners, physician assistants, and doctors, on multiple occasions, and she repeatedly obtained treatment for her left shoulder pain.  (Doc. #1 at ¶¶ 58, 87-88, 99, 102-05, 117, 130, 132, 139, 142, 157, 162, 167, 169, 171, 181).  Indeed, in her response to the Medical Defendants' motion, August acknowledges that she was "seen by nurses more than 25 times over the past five years" for her shoulder injury, as well as three or four times by a physician's assistant, and five or six times by a doctor.  (Doc. #78 at 12).  And, while no definitive diagnosis was reached, the potentially most serious condition – a full thickness rotator cuff tear – was excluded.  (Doc. #65-3 at ¶¶11, 13, 32 ("The one thing we were able to determine was that Plaintiff did not have a significant rotator cuff injury.  On two occasions, providers documented negative results in the drop arm test.  This is diagnostic."); Doc. #65-6 at ¶4).  All of the other diagnoses that were considered by various providers – adhesive capsulitis, strain/sprain, shoulder pain, rotator cuff syndrome, and impingement syndrome – call for the same treatment, which August was provided (namely shoulder movement, pain control, symptom management, and steroid injections).  In other words, far from ignoring August's medical condition, the Medical Defendants repeatedly attempted to assess her reports of pain and functional limitations, and they provided treatment

16

deemed appropriate for August's potential diagnoses.

Courts distinguish between "cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (internal quotations omitted). While the former cases may evidence the type of culpability required to state a deliberate indifference claim, the latter amount to assertions of medical negligence and do not satisfy the requisite subjective component of such claims. *Id.* Indeed, courts have recognized, "In cases where an inmate alleges deliberate indifference but the record demonstrates that the inmate received medical attention and is, in essence, filing suit because he disagrees with certain decisions made by the medical staff, the defendant is entitled to summary judgment." *Allison v. Martin*, 2009 WL 2885088, at *6 (E.D. Mich. Sept. 2, 2009) (internal citations omitted); *see also Umbarger v. Corr. Medical Servs.*, 93 F. App'x 734, 736 (6th Cir. 2004). This is exactly the case here: August was seen by numerous medical professionals after she injured her shoulder and was provided various and ongoing forms of treatment (including shoulder exercises, pain medications, instructions with respect to stretching, massage, and compresses, and steroid injections). The fact that she believes different (or additional) treatment was warranted is simply insufficient to survive summary judgment under the relevant case law. *See Allison,* 2009 WL 2885088, at *6; *Umbarger*, 93 F. App'x at 736.[11]

---

[11] With her response to the Medical Defendants' motion, August submitted affidavits from several of her fellow inmates, each of which purports to attest to August's ongoing shoulder pain, as well as the inadequacy of the medical treatment she was provided. (Doc. #78-2 at 51-55). For example, Laura Kate Astrakhan, August's former cellmate, stated that August's "requests for treatment were ignored." (*Id.* at 51). And, Sheila Dinger, a registered nurse, indicated that August had "all the classic symptoms of a torn rotator cuff" and that the medical treatment she received fell "well below the minimal standard of care." (*Id.* at 53-54). These affidavits are insufficient to create a genuine issue of material fact. The unrebutted documentary evidence establishes that August was, in fact, treated on multiple occasions. And, there is no

17

As for August's more specific allegations, the Court finds them similarly without merit. For example, August alleges that she did not see a medical doctor until March 31, 2010, and asserts that this "significant delay in treatment" rises to the level of deliberate indifference. (Doc. #78 at 7, 16).  As set forth above, however, August was seen by a nurse on August 28, 2009 (just three days after her shoulder injury), who determined that August should be referred to an MSP.  (Doc. #67-3 at 37).  August was then seen <u>that very same day</u> by a nurse practitioner – an MSP – who assessed her with a left shoulder strain and prescribed Motrin, placed her arm in a sling, and provided ice packs.  (*Id.* at 29).  August was also seen by a physician's assistant on September 5, 2009, who determined that she should discontinue use of the sling and begin pendulum exercises to prevent adhesive capsulitis.  (*Id.* at 23).  Additionally, August was seen by a nurse on March 17, 2010, who noted that she still had a limited range of motion and assessed her with a sprain/strain.  (*Id.* at 15).  Thus, although August may not have seen a doctor until March 31, 2010, she was timely seen prior to that date by two nurses and two mid-level providers (a nurse practitioner and a physician's assistant), neither of whom diagnosed her with a serious injury.  She received treatment that these providers deemed appropriate, and neither of these providers (who are <u>not</u> defendants in this case) referred August to be seen specifically by a doctor.  Thus, there simply is no factual support for August's claim of an improper delay in treatment, nor is there legal authority for the proposition that an inmate must be seen by a doctor (as opposed to other medical professionals).  *See, e.g., Davis v. Caruso*, 2008 WL 4561659, at *21 (E.D. Mich. Oct. 10, 2008) (citing *Banks v. County of Allegheny*, 568 F. Supp. 2d 579 (W.D. Pa. 2008) ("…the Constitution does not mandate that inmates be seen and treated necessarily by doctors.")).

---

indication that the Medical Defendants were deliberately indifferent to a serious medical need, which, as discussed above, requires more than showing the provision of substandard care.

August also alleges that the Medical Defendants were deliberately indifferent by failing to order additional diagnostic testing or refer her to a specialist for a definitive diagnosis.[12] (Doc. #78 at 8, 16-18). Specifically, August asserts that "none of the [Medical] Defendants have ordered an MRI or CT Scan to rule out muscle damage, tendon damage, nerve damage, or ligament damage."[13] (*Id.* at 8). Apparently, August believes that each of the Medical Defendants was required to make a definitive diagnosis and/or refer her for specialized testing or consultation. This argument is untenable for multiple reasons.

As the Medical Defendants' uncontested affidavits make clear, diagnosis of August's condition was made difficult by her presentation. (Doc. #65-3 at ¶32). Three of the four Medical Defendants – Drs. Onuigbo, Szymanski, and Qin – as well as Dr. de Guzman, saw August on only one occasion. Although Dr. Szymanski did not formally diagnose August after examining her only once, he was considering the possibility that she might have impingement syndrome. (Doc. #65-5 at ¶4). Each of the other physicians who examined August diagnosed

---

[12] In her response brief, August asserts that when she saw Dr. de Guzman on June 23, 2010, he assessed her with rotator cuff syndrome and told her she "should be seen by a specialist." (Doc. #78 at 17). Although August's medical records confirm Dr. de Guzman's assessment of her condition, there is no indication that he believed it necessary for her to see a specialist. (Doc. #67-2 at 97). Rather, the progress notes indicate that he intended to prescribe a trial course of NSAIDS. (*Id.*).

[13] In her brief, August claims that she repeatedly requested an MRI but "was always told 'the state won't approve an MRI for a shoulder injury because it cost[s] to[o] much.'" (*Id.* at 16). She does not indicate who purportedly made this statement – or when – and such a vague allegation of cost containment is insufficient to create a genuine issue of material fact as to the Medical Defendants' intentions. *See Lowe v. Vadlamudi*, 2009 WL 736798, at *5 (E.D. Mich., Mar. 16, 2009) ("Cost control measures initiated by state and local governments by themselves are not unconstitutional. In fact, they are desirable. [The MDOC defendant's] knowledge of a policy that encourages cost containment does not translate into deliberate indifference to the plaintiff's medical needs in this case, since there is no suggestion in the pleadings that [the official] was aware of those needs and specifically disregarded them."); *Brightwell v. Lehman*, 2006 WL 931702, at *8 (W.D. Pa., Apr. 10, 2006) ("Resources are not infinite and reasonable allocation of those resources, taking into account cost, does not amount to deliberate indifference…").

her with similar conditions, including chronic shoulder pain, rotator cuff syndrome (which describes a sprain or strain in the area of the rotator cuff), adhesive capsulitis, and/or arthritis. (Doc. #67-3 at 10; Doc. #67-2 at 55, 97; Doc. #65-3 at ¶¶11, 28).

Notably, the one thing that all of the Medical Defendants were able to determine was that August did not have a significant rotator cuff injury.  (Doc. #65-3 at ¶32).  On two occasions, providers documented negative results in the drop arm test, which diagnostically excluded a significant rotator cuff tear.  (Doc. #67-2 at 97; Doc. #65-3 at ¶11).  According to Dr. Lacy, because the Medical Defendants were able to rule out the more serious condition of a full thickness rotator cuff tear, "There was no reason to refer Plaintiff to see a specialist or to receive other types of diagnostic tests, such as an MRI."  (Doc. #65-3 at ¶32).

To summarize, the provisional diagnosis that was provided by two of the Medical Defendants was adhesive capsulitis.  Rotator cuff syndrome and impingement syndrome – two of the other diagnoses – can lead to adhesive capsulitis due to inactivity.  (Doc. #65-3 at ¶32).  The Medical Defendants have provided uncontradicted evidence that whether August had one or more of these conditions is irrelevant, as the treatment for each is the same (shoulder movement, pain control, symptom management, steroid injection, and physical therapy).  (*Id.*).  With the exception of physical therapy, the Medical Defendants provided some or all of these treatments. Simply put, there is no evidence that the Medical Defendants were deliberately indifferent to August's condition.   Rather, the evidence establishes that each exercised his or her own independent medical judgment and prescribed a plan of treatment deemed appropriate.  The fact that August disagrees with prison medical staff regarding the kinds of testing and treatment that are necessary does not rise to the level of deliberate indifference. *See, e.g., Umbarger*, 93 F. App'x at 736; *Owens v. Hutchinson*, 79 F. App'x 159, 161 (6th Cir. 2003) (patient's

20

disagreement with his physicians over the proper medical treatment is not cognizable as a federal constitutional claim); *Estate of Chance v. First Correctional Medical Inc.*, 579 F. Supp. 2d 583, 589 (D.Del. 2008) ("An inmate's claims against members of a prison medical department are not viable under §1983 where the inmate receives continuing care, but believes that more should be done by way of diagnosis and treatment and maintains that options available to medical personnel were not pursued on the inmate's behalf.") (citing *Estelle*, 429 U.S. at 107).[14]

August also alleges that her shoulder injury "has progressively gotten worse over the past five years" and that "she does not receive adequate pain management due to the cost." (Doc. #78 at 9). It is unclear exactly what medication August believes she should have been prescribed, as she indicates in her affidavit that she did not "make any requests for narcotics" or "demand pain killers." (Doc. #78-2 at 47, ¶27). Indeed, narcotics were deemed to be not medically indicated. (Doc. #65-3 at ¶12). Both the medical records and August's own admissions make clear that she was prescribed some pain medication. (Doc. #78 at 16-17; Doc. #67-2 at 55, 81, 97; Doc. #67-3 at 10, 29). Although August might not have been prescribed the exact medication she would have preferred, her allegations of deliberate indifference are unsupported. Again, the law in this Circuit is clear that mere differences of opinion or disagreements between a prisoner and prison medical staff over the kinds of treatment a prisoner needs are not sufficient to rise to the level of deliberate indifference. *See Umbarger*, 93 F. App'x at 736.

---

[14] August cites *LeMarbe v. Wisneski*, 266 F.3d 429 (6th Cir. 2001), for the proposition that failure to make a timely referral to a specialist constitutes deliberate indifference. (Doc. #78 at 17). That case is distinguishable, however, as it involved a physician who became aware of a biliary fluid leak during the plaintiff inmate's surgery but, unable to find the reason for the leak, simply closed the inmate's surgical incision and ended the surgery. The *LeMarbe* court found that the doctor knew that the plaintiff faced a substantial risk of serious harm from the bile leak in his abdomen, disregarded the risk when he closed the incision, and thus was deliberately indifferent. *Id.* at 438. In this case, there is no indication that the Medical Defendants were aware of or disregarded a substantial risk of serious harm to August.

With respect to August's contention that Dr. Lacy "dug his fingers into [her] back shoulder blade" during an August 11, 2010, examination (Doc. #78 at 17), Dr. Lacy has disputed August's allegations.  Indeed, in his sworn affidavit, Dr. Lacy explained the manner in which he examined August; the fact that he used a standard technique; and that he did not intentionally inflict unnecessary pain.  (Doc. #65-3 at ¶14).  Dr. Lacy also pointed out that his progress notes from this visit do not reflect that August expressed any significant pain during the examination, which is something he would have noted.  (*Id.*).  Even assuming August's allegations to be true, however, the fact that August might have suffered some pain during this examination this does not rise to the level of a constitutional violation.  Clearly, some medical examinations are uncomfortable but necessary, and even if August did suffer some transitory pain during this examination, this would not support a claim of deliberate indifference.  *See Brown v. Deparlos*, 492 F. App'x 211 (3rd Cir. 2012) (plaintiff's contention that doctor violently twisted his head during an examination failed to state a constitutional claim, as allegations of medical malpractice and disagreement concerning proper treatment are insufficient to support an Eighth Amendment claim).

Finally, August contends that Dr. Lacy failed to timely provide her with a bottom bunk detail, which led to her falling from a top bunk on March 11, 2013.  (Doc. #78 at 16-17).  She asserts that while Dr. Lacy might have entered an order for a bottom bunk in the computer, he failed to follow proper procedure to ensure that this order was implemented.  (*Id.* at 9).  As the Medical Defendants point out, however, August's alleged fall occurred after the filing of the complaint in this matter, and she failed to move to amend her complaint for nineteen months following this event.  Her one-sentence request for permission to now amend her complaint "to include her injuries to her lower back, neck and knees as part of her damages" (*Id.* at 22) is too

22

little, too late.  Such a motion to amend would be both untimely – as the Medical Defendants'
dispositive motion has been pending for more than six months – and futile, as August's
allegation that Dr. Lacy negligently failed to implement his order fails to state a constitutional
claim.  *See, e.g., Bout v. Bolden*, 22 F. Supp. 2d 646, 650 (E.D. Mich. 1998).

In summary, the allegations contained in August's complaint and response brief establish
that her concerns about her left shoulder were repeatedly addressed, and the evidence
demonstrates that she received ongoing treatment for this condition.  Thus, the Medical
Defendants did not ignore August's concerns; rather, they took action to address her issues
(albeit perhaps not as quickly or in the exact fashion that August would have liked).  As a result,
August cannot succeed on a deliberate indifference claim against the Medical Defendants.  *See*
*Alspaugh*, 643 F.3d at 169; *Allison*, 2009 WL 2885088, at *6; *Umbarger*, 93 F. App'x at 736.
For this reason, summary judgment should be granted in favor of the Medical Defendants on
August's Eighth Amendment claim.

## III.   CONCLUSION

For the reasons set forth above, **IT IS RECOMMENDED** that the Medical Defendants'
Motion for Summary Judgment [**65**] be **GRANTED**.

Dated: January 9, 2015                         s/David R. Grand
Ann Arbor, Michigan                            DAVID R. GRAND
                                               United States Magistrate Judge

## REVIEW

Either party to this action may object to and seek review of this Report and
Recommendation, but must act within fourteen (14) days of service of a copy hereof as provided
for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections

constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985);

*Howard v. Sec'y of HHS*, 932 F.2d 505 (6th Cir. 1991)*; United States v. Walters*, 638 F.2d 947

(6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity

will not preserve all objections that party might have to this Report and Recommendation.  *See*

*Willis v. Sec'y of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers*

*Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  A copy of any objection must be served upon

this Magistrate Judge.  *See* E.D. Mich. L.R. 72.1(d)(2).

   *Note these additional requirements at the direction of Judge Michelson:*

   Each **objection must be labeled** as "Objection #1," "Objection #2," etc., and **must**

**specify** precisely the provision of this Report and Recommendation to which it pertains.  Not

later than fourteen (14) days after service of objections, **the non-objecting party must file a**

**response** to the objections, specifically addressing each issue raised in the objections in the same

order and labeled as "Response to Objection #1," "Response to Objection #2," etc.  The response

must be **concise and proportionate in length and complexity to the objections**, but there is

otherwise no page limitation.


### CERTIFICATE OF SERVICE

   The undersigned certifies that the foregoing document was served upon counsel of record
and any unrepresented parties via the Court's ECF System to their respective email or First Class
U.S. mail addresses disclosed on the Notice of Electronic Filing on January 9, 2015.

                              s/Eddrey O. Butts
                              EDDREY O. BUTTS
                              Case Manager