UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRACY AUGUST, #714643,

     Plaintiff,

v.

FELICIA RATLIFF,

     Defendant.

Case No. 12-13775
Honorable Laurie J. Michelson
Magistrate Judge David R. Grand

---

**OPINION AND ORDER FOLLOWING REMAND FROM THE UNITED STATES
COURT OF APPEALS FOR THE SIXTH CIRCUIT [104]**

---

In 2012, Plaintiff Tracy August, a Michigan prisoner, filed this lawsuit based on a shoulder injury she sustained while in the custody of the Michigan Department of Corrections ("MDOC"). August alleged that Defendant-officer Felicia Ratliff ordered her to restrain an inmate having a violent seizure, and when August complied, the inmate slammed her into a railing where August's arm got caught and ripped upward as the two fell to the ground, injuring August's shoulder. August asserted a "failure-to-protect" claim against Ratliff for giving her the order. She also asserted that the medical treatment she received after the injury was constitutionally inadequate. Eventually, the case was dismissed as to all defendants and August filed a notice of appeal.

The Sixth Circuit largely affirmed the dismissal of August's claims, but reversed and remanded for this Court's consideration of the following issues surrounding Ratliff:

> A remand is required . . . with respect to the summary judgment in favor of Officer Ratliff on August's failure-to-protect claim. . . . Because it is unclear based upon the record before this court whether the failure-to-protect claim has been exhausted and because this claim was not addressed by the district court on the merits, this claim must be remanded.

(R. 104, PID 1984.)

Following remand, this Court requested that the parties submit supplemental briefing on these issues in addition to the motion for summary judgment (R. 24) that Ratliff filed earlier in the case. That briefing is now complete, and the matter is ready for disposition. After careful consideration of the briefs and thorough review of the pleadings, the Court finds that oral argument will not aid in resolving the issues the Sixth Circuit asked the Court to resolve on remand. *See* E.D. Mich. LR 7.1(f)(2). The Court finds that Ratliff is not entitled to summary judgment based on non-exhaustion, nor is Ratliff entitled to qualified immunity. Accordingly, this case will proceed to trial.

## I.  BACKGROUND

August alleged in her Complaint that on August 25, 2009, she was let out of her cell for an hour of recreation time. (R. 1, PID 10.) At that time, she observed another inmate, "Jenks," having "one of her violent seizures." (*Id.*) According to the Complaint, Jenks was in "a full blown seizure[] swinging her arms violently, snapping her teeth, rolling her eyes into the back of her head, and spinning around incoherently close to the upstairs railing." (*Id.*) Holly Patterson, another inmate, avers that she witnessed the situation and says that Jenks was "swinging her arms violently out of control as she was turning in a circular motion" and that other inmates were yelling for an officer because it looked like Jenks might fall down the stairs. (*Id.* at PID 51.) Patterson avers that Jenks has seizures "on a daily basis" and "has hurt herself many, many times during these seizures." (*Id.*) Michelle O'Neil, also an inmate, avers that she too witnessed the situation. (*Id.* at 54.) O'Neil says that at the time, Jenks was "swinging her arms violently in all directions with her head rolling in different directions." (*Id.* at 54.)

2

As August came upon the scene, another inmate was yelling for a guard. (*Id.* at 10.) Defendant-officer Felicia Ratliff came up the stairs towards Jenks and ordered August to "come back and set Jenks down." (*Id.*) August hesitated (O'Neil avers that as August approached, Jenks "began to swing her arms at inmate August and snap[] her teeth trying to bite August." (*Id.* at 54)) but complied with the order. (*Id.* at 10.) As August attempted to help Jenks to the ground, Jenks threw her body backwards against the upstairs railing, where August's arm was caught and yanked upwards while pinned under Jenks's body. (*Id.* at PID 11.) August asked Ratliff for help but Ratliff did nothing. (*Id.*) August remained pinned for approximately two minutes. (*Id.*) August avers that she had previously witnessed Jenks seizing in Ratliff's presence, and that Ratliff had never attempted to assist Jenks. (R. 1, PID 47.) August's complaint included several affidavits from other inmates which support her account of what happened that day. These include notarized affidavits from Michelle O'Neil (R. 1, PID 54) and Holly Patterson (R. 1, PID 51); and non-notarized affidavits from "Rollston," (R. 1, PID 55), Virginia Helsel (R. 1, PID 57), "K. Wanna" (R. 1, PID 58), and Jenks (R. 1, PID 48).

Additionally, Lana McCarthy, the Acting Health Unit Manager, avers that "[P]risoner August #714643 was seen on August 28, 2009, for left shoulder pain. Prisoner August #714643 stated she was ordered by an officer to help an inmate while having a seizure." (R. 24-4, PID 423.) McCarty did not say, however, whether August identified any officer in particular. (*Id.*)

August filed several grievances regarding her injury and subsequent treatment. Relevant here are Grievance Numbers 09-08-3352-03B, in which August asserted that Ratliff gave her an "unreasonable direct order" (R. 9, PID 127), and 09-09-3582-03D, in which August asserted that she had suffered mental distress and physical injury after being ordered to restrain Jenks (R. 9,

PID 133). The parties dispute whether August pursued these grievances to completion under the applicable MDOC policy.

Ratliff, for her part, avers that she "do[es] not recall this specific incident regarding prisoner August." (R. 24-2, PID 416.) She further avers, "I have learned through my training that you are not to restrain a seizing person. I would not have given a prisoner that order." (*Id.*)

At issue on remand are: (1) whether August exhausted her administrative remedies for her failure-to-protect claim against Ratliff, and (2) if so, whether Ratliff is entitled to qualified immunity.

## II. LEGAL STANDARD

In addition to their remand briefs, and in spite of the fact that no depositions have been taken in this case, the parties have incorporated their summary-judgment briefs on the issues presented. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 451 (6th Cir. 2004 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A fact is material only if its resolution will affect the outcome of the lawsuit." *Hedrick*, 355 F.3d at 451–52 (citing *Anderson*, 477 U.S. at 248). In evaluating a motion for summary judgment, this Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

If the moving party bears the burden of persuasion at trial, her initial showing "must be sufficient for the court to hold that no reasonable trier of fact could find other than for the

4

moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quotation omitted). If the moving party does not bear the burden of persuasion at trial, she may discharge her initial burden either by "submit[ing] affirmative evidence that negates an essential element of the nonmoving party's claim. . . . [or] by demonstrat[ing] to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986). If this burden is met, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587.

## III. ANALYSIS

The Court finds that, examining exhaustion under the proper legal standard, Ratliff has not carried her burden at the summary-judgment phase to show that every reasonable jury would find that August failed to exhaust her administrative remedies. And in passing on the merits of August's failure to protect claim for the first time, the Court finds that Ratliff is not entitled to qualified immunity on this claim.

### A.  Exhaustion

The Prison Litigation Reform Act requires a state prisoner to give the state a fair and full opportunity to remedy her claims before filing suit in federal court. *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any . . . correctional facility until such administrative remedies as are available are exhausted."); *Woodford v. Ngo*, 548 U.S. 81, 90 (2006) ("Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claim.").

Exhaustion is an affirmative defense. *Jones v. Bock*, 549 U.S. 199, 212 (2007). So to be granted summary judgment on non-exhaustion grounds, Ratliff must convince the court that no reasonable jury could find that August exhausted the claim in question. *See Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012).

The Court is mindful that "all prison grievance procedures are not made alike, and what a prisoner is required to do by one grievance procedure to exhaust his administrative remedies is not necessarily required by another." *Troche v. Crabtree*, 814 F.3d 795, 801 (6th Cir. 2016). In Michigan's correctional facilities, the applicable policy is Michigan Department of Corrections Policy Directive Number 03.02.130. (R. 24-6.) The Policy provides, "Complaints filed by prisoners regarding grievable issues as defined in this policy serve to exhaust a prisoner's administrative remedies only when filed as a grievance through all three steps of the grievance process in compliance with this policy." (R. 24-6, PID 434.) Before submitting a written grievance, the grievant "shall attempt to resolve the issue with the staff member involved . . . unless prevented by circumstances beyond his/her control . . . ." (*Id.* at PID 435.) If the issue is not resolved, the grievant has five days to file a Step I grievance. (*Id.*) If the grievant is dissatisfied with the response received at Step I, or if the grievant did not receive a timely response, she may file a Step II grievance within ten business days of receipt or within ten business days of the response due date. (*Id.* at PID 437.) If the grievant is dissatisfied with the Step II response or does not receive a timely response, she may file a Step III grievance within ten business days of receiving the response or within ten business days after the response was due. (*Id.* at PID 438.) The opening sections of the Policy emphasize that a lack of response is not a bar to continuing through the grievance process:

> If a grievant chooses to pursue a grievance which has not been responded to by staff within required time frames, including any extensions granted, the grievant

may forward the grievance to the next step of the grievance process within ten business days after the response deadline expired, including any extensions which have been granted.

(*Id.* at PID 436.) With these standards in mind, the Court finds that Ratliff has not carried her burden to show that no reasonable jury could find proper exhaustion.

As to Step I, it is undisputed that MDOC received Grievance 09-08-3352-03B on August 28, 2009 (R. 9, PID 128), and received Grievance 09-09-3582-03D on September 14, 2009 (*Id.* at PID 135). Therefore, MDOC's responses were due on September 18, 2009, and October 5, 2009, respectively. (*Id.* at PID 131, 137.)

According to the response reviewer L. Williams, "Because [the] two grievance[s] were closely related, [the responding officer, Sergeant Godfrey] combined them into one grievance and responded to the two of them" together in one response at Step II. (R. 9, PID 129.) Apparently there was an extension to the due date for the response, as August's appeal was due on March 11, 2010. (R. 9, PID 130.) August filed a Step II appeal from that response, which the Grievance Coordinator received on March 12, 2010. (R. 9, PID 131.) Therefore, the Step II response was due by April 2, 2010. (*Id.*)

At this point, the parties' accounts diverge. Ratliff argued, and the Magistrate Judge and District Judge formerly assigned to the matter agreed (or declined to address) (R. 45, PID 739; R. 53, PID 859), that because the grievances are not listed on the Step III Grievance Report for Tracy August (R. 24-7, PID 441), August must not have pursued the grievances past Step II. But the Step III Grievance Report is not the end of the record evidence.

August argues that she proceeded to Step III, yet her attempt to file a Step III appeal was rebuffed because she failed to attach the Step II response to her form—a response that she never received. Record evidence supports this assertion. August attached a letter she received from

7

Richard Russell, the Acting Manager of the Grievance and Appeals Section, regarding "GRIEVANCE I.D. #WHV-09-09-3582-03d" (the identifier for the first grievance). (R. 49, PID 792.) The letter reads, "Your correspondence(es) is returned to you for the following reason(s): . . . You must include a readable/completed Step II Grievance Appeal Form . . . You must include the step II response(s) . . . You must complete all of the above step I and step II grievance processes before appealing to Step III." (*Id.*) August also included multiple letters she sent to Russell and other prison officials stating that she was still waiting for a Step II response. (R. 49, PID 794–803; R. 109, PID 2029.) Ratliff makes no argument that these letters were not received. (R. 110, PID 2046.)

"When pro se inmates are required to follow agency procedures to the letter in order to preserve their federal claims, we see no reason to exempt the agency from similar compliance with its own rules." *Risher v. Lappin*, 639 F.3d 236, 241 (6th Cir. 2011). Based on August's submissions, a reasonable jury could find that August made "affirmative efforts," *id.*, to comply with the grievance policy when, having failed to receive a Step II response, consistent with the Policy, she filed a Step III grievance. *See Troche*, 814 F.3d at 799 ("[W]e must examine [plaintiff's] declaration—because it was the only 'evidence' submitted with his Response to [defendant's] summary judgment motion—and determine adequately if it creates a genuine issue of material fact as to whether [plaintiff] adequately complied with Ohio's three-step grievance procedure."). Furthermore, Ratliff does not explain why August's attempt to file a Step III grievance was not logged in the system when the Policy clearly states that "[e]ach grievance received at Step III, *including those which may be rejected*, shall be logged on a computerized grievance tracking system." (R. 24-6, PID 438 (emphasis added).) This discrepancy further raises a genuine issue of material fact concerning whether August exhausted her claim.

8

Accordingly, Ratliff is not entitled to summary judgment based on August's alleged failure to exhaust her claims. The Court will proceed to the merits of the failure-to-protect claim.

## B.  Failure to Protect

August asserts that Ratliff violated her constitutional rights when, though "fully aware of the dangers and risk," she ordered August to restrain an inmate who was having a seizure. (R. 109, PID 2005). Ratliff asserts that she is entitled to qualified immunity for this claim.

In order to defeat a qualified-immunity defense, a plaintiff must establish (1) that the defendant violated a constitutional right; and (2) that the right was "clearly established" at the time of the violation. *Leary v. Livingston Cty.*, 528 F.3d 438, 441 (6th Cir. 2008) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). District courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 232. "In assessing . . . immunity at the summary judgment phase of the case, [courts] give the plaintiff the benefit of all reasonable factual inferences from the record, asking only whether the officers are entitled to judgment as a matter of law." *Krause v. Jones*, 765 F.3d 675, 679 (6th Cir. 2014).

In this case, the Court will address the "clearly established" prong first. Ratliff argued in her initial remand brief that she "could not find any case law suggesting that her actions in this case violated clearly established law." (R. 107, PID 1993.) August responds that the "clearly established" right she relies on has its basis in *Farmer v. Brennan*, 511 U.S. 825 (1994). That case affirmed that "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Id.* at 833; *see also Knight v. Gill*, 999 F.2d 1020, 1022 (6th Cir. 1993) ("The deliberate indifference standard, first articulated in [*Estelle v. Gamble*, 429 U.S. 97 (1976)] has since been extended to impose upon both federal and state correctional officers and

9

officials the obligation to take reasonable steps to protect inmates from violence at the hands of other inmates." (citations and internal marks omitted)).

The Sixth Circuit recently reiterated that "the constitutional right . . . to be free from violence at the hands of other inmates" was clearly established in *Farmer*. *Richko v. Wayne Cty.*, 819 F.3d 907, 915 (6th Cir. 2016). However, "the Supreme Court has 'repeatedly' warned lower courts not to define the [constitutional] right at 'a high level of generality.'" *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 508 (6th Cir. 2012) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2084 (2011). As the Sixth Circuit has explained, "If a court does not carefully define the right, it risks collapsing the two qualified-immunity inquiries into one, permitting the constitutional-violation inquiry always to answer the clearly established inquiry." *Id.* The Court believes that a "reasonably particularized" definition of the right at issue here would be an inmate's right not to be needlessly ordered to restrain another prisoner engaged in violent behavior.

For this right to be "clearly established,"

[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987). "Without question, prison officials have an affirmative duty to protect inmates from violence perpetrated by other prisoners." *Richko*, 819 F.3d at 915 (quoting *Wilson v. Yaklich*, 148 F.3d 596, 600 (6th Cir. 1998)).

Numerous cases from before the incident in question in this case establish that exposing an inmate to "gratuitous" violence at the hands of other prisoners serves "no legitimate

10

penological objective" and is "simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Farmer*, 511 U.S. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)). Cases in this realm often discuss the affirmative duty to protect inmates from premeditated assaults by other inmates. *See*, *e.g.*, *Leary*, 528 F.3d at 442 (assault after other inmates learned that the plaintiff was convicted of a sexual offense involving a child; *Doe v. Bowles*, 254 F.3d 617, 620 (6th Cir. 2001) (assault after a female-presenting male prisoner was threatened by an inmate with a history of violent attacks); *Walker v. Norris*, 917 F.2d 1449, 1453 (6th Cir. 1990) (failure to intervene after plaintiff's decedent was chased through the prison unit with a knife by another prisoner and had begged to be let into the yard to get away). They have also discussed a duty to refrain from confining vulnerable inmates in close quarters with a sexually violent offender. *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011) (sexual assault of a young prisoner confined with an inmate who had a history of sexually inappropriate behavior). But the general consensus is this: an officer "may be held to be deliberately indifferent to a substantial risk to inmate safety if he is aware that an inmate is vulnerable to assault and fails to protect him." *Id.* at 767.

It is similarly clear that "[i]nmates cannot be permitted to decide which orders they will obey, and when they will obey them." *Caldwell v. Moore*, 968 F.2d 595, 601 (6th Cir. 1992) (citing *Soto v. Dickey*, 744 F.2d 1260, 1267 (7th Cir. 1984)). But this principle has its basis in protecting prison security, which the Supreme Court has repeatedly stated is "central to all other corrections goals." *Thornburgh v. Abbott*, 490 U.S. 401, 415 (1989) (citing *Pell v. Procunier*, 417 U.S. 817, 823 (1974)). Thus, the Court is not convinced that an order for an inmate to needlessly intervene in violent behavior by another prisoner would fall within this law.

11

The Court believes that based on the *Farmer* line of cases as well as the Supreme Court case law regarding prison safety and inmates' obligations to obey direct orders, any reasonable officer, *see Groh v. Ramirez*, 540 U.S. 551, 563 (2004); *Folks v. Petitt*, No. 16-3596, — F. App'x —, 2017 U.S. App. LEXIS 1348, at *11 (6th Cir. Jan. 23, 2017), would have perceived that an inmate's right to be free of unnecessary orders to restrain a violent prisoner was clearly established at the time of the present incident.

Thus, turning to the violation prong, a failure-to-protect claim pursuant to *Farmer* contains both a subjective and an objective component:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837.

First, the Court asks whether, from an objective standpoint, the risk was "sufficiently serious." *Leary v. Livingston Cty.*, 528 F.3d 438, 442 (6th Cir. 2008); *Brooks v. Celeste*, 39 F.3d 125, 127–28 (6th Cir. 1994). Taking the facts in the light most favorable to August, a reasonable jury could so find. Ratliff herself states, "I have learned through my training that you are not to restrain a seizing person." (R. 24-2, PID 417.) And the inmate in question, Jenks, had a history of violent seizures. On the date in question, by witness accounts, Jenks was in fact having a violent seizure, "swinging her arms violently out of control" (R. 1, PID 51 (Patterson Aff.)) while "snapping her jaws" with "her head rolling in different directions." (R. 1, PID 54 (O'Neill Aff.)) A jury could find that an order to restrain such an inmate would pose a sufficiently serious risk of injury.

Second, the Court asks whether Ratliff "kn[ew] that [August] face[d] a substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. Again, the most telling piece of evidence here is Ratliff's own affidavit: "I have learned through my training that you are not to restrain a seizing person. I would not have given a prisoner that order." (R. 24-2, PID 417.) Thus, Ratliff admits that it would not be reasonable to order an inmate to restrain another inmate having a seizure. And in addition to this, taking the situation from Ratliff's perspective at the time, *see Jackson v. Everett*, 140 F.3d 1149, 1152 (8th Cir. 1998), record evidence reflects that (1) Ratliff had witnessed Jenks having violent seizures in the past; (2) Ratliff had already observed Jenks seizing for some time before ordering August to intervene; (3) Jenks was swinging her arms, rolling her head, and snapping her teeth; (4) August did not intervene of her own accord; (5) Ratliff gave an affirmative command for August to insert herself into the situation and restrain Jenks; and (6) Ratliff did nothing to assist.

Based on these facts, the Court concludes that a reasonable jury could find that the risk Jenks posed was sufficiently serious, and given the knowledge and training Ratliff had at the time, by ordering August to restrain Jenks, Ratliff acted with deliberate indifference to August's safety.

Accordingly, the Court finds that Ratliff is not entitled to qualified immunity for the failure-to-protect claim.

## IV. CONCLUSION

For the foregoing reasons, in consideration of the issues remanded, the Court finds that as to August's failure-to-protect claim, Ratliff did not meet her burden to prove non-exhaustion, and that Ratliff is not entitled to qualified immunity.

13

Accordingly, IT IS ORDERED that this case is REOPENED and trial dates will be set. The Court will entertain a Renewed Motion to Appoint Counsel from August, should she choose to file one at this stage.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
Dated: February 3, 2017                          U.S. DISTRICT JUDGE

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 3, 2017.

s/Keisha Jackson
Case Manager